**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | CRIMINAL NO. 22-CR-96 (CKK) |
| | : | |
| HEATHER IDONI, | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, hereby, submits this memorandum in support of its sentencing recommendation for Defendant Heather Idoni ("Idoni").

I.    **Introduction**

Idoni is an active anti-abortion extremist, with a history of participating in reproductive health clinic invasions around the country to prevent patients from obtaining, and providers from providing, pregnancy termination services.   She traveled from Michigan to Washington, D.C. with one goal: prevent women from accessing reproductive health care.   To accomplish that goal, on October 22, 2020, Idoni and her co-defendants invaded the Washington Surgi-clinic ("Surgi-clinic" or "clinic") and used force and physical obstructions to interfere with access to the clinic. Idoni used her body to block a clinic door and interfered with patients' access to the facility.   For this reason, she was convicted by a jury of civil rights conspiracy and Freedom of Access to Clinic Entrances (FACE) Act offenses for her role in planning and executing the clinic blockade.[1]

---

[1] On January 30, 2024, Idoni was also convicted of civil rights conspiracy and FACE Act offenses in connection with a 2021 clinic blockade in Tennessee.  *See United States v. Gallagher*, et al., 22-cr-324 (M.D.TN), ECF No. 516.

1

To address the gravity of her federal offenses and further the goals of the criminal justice system, the government recommends that the Court sentence Idoni to term of incarceration at the high-end of Idoni's recommended Sentencing Guidelines range, which is 33-41 months at a combined adjusted offense level 20 and criminal history category I.

## II.      Procedural Posture

On October 14, 2022, the grand jury returned a two-count superseding indictment, charging Idoni and her co-defendants with violating 18 U.S.C. § 241 (conspiracy against rights) and 18 U.S.C. § 248(a)(1) (FACE Act).    ECF No. 113.    These charges stemmed from Idoni's participation in a scheme to obstruct access to the Surgi-clinic - a women's reproductive health clinic - located in the District of Columbia, and her participation in the blockade of that facility on October 22, 2020.    After a jury trial, on August 29, 2023, Idoni was found guilty of both charges. *See* Minute Entry, Aug. 29, 2023.    The jury also determined that Idoni had violated the FACE Act by both force and physical obstruction.    *Id*.

## III.     Overview of the Crimes

During trial, the government presented the testimony of several witnesses and admitted approximately sixty exhibits into evidence. This evidence proved that the co-defendants collectively invaded the Washington Surgi-clinic ("Surgi-clinic" or "clinic") to block, for as long as possible, access to reproductive health care, and in doing so, injured one of the clinic's nurses and inflicted significant trauma on patients.

The evidence proved that the clinic blockade was planned and organized by individuals local to Washington, D.C., including co-defendants Lauren Handy ("Handy") and Jonathan Darnel ("Darnel").    Handy and Darnel advertised a call-to-action on social media, and invited

participants to join the planned blockade. *See, e.g.*, Exhibit Nos. 5066, 5082-83. Their co-defendants, along with other unindicted co-conspirators, traveled from out-of-state to participate in the October 22, 2020, crime.

The co-defendants communicated about the planned blockade between October 7, 2020, and October 22, 2020, using social media, text messaging, phone calls, and in-person meetings. *See, e.g.*, Exhibit Nos. 3005, 4001A, 5066, 5070, 5072, 5083, 5091, 7361, 7362; 10/25/23 Trial Tr. at 158:5-12,159:3-163:2. The co-defendants communicated that the purpose of the planned Surgi-clinic blockade was to stop the clinic from providing, and patients from obtaining, reproductive health services. *Id.* In planning the blockade, Handy also scheduled a fake patient appointment at the clinic for October 22, 2020, under the name "Hazel Jenkins," to gain access to the clinic facility. *See, e.g.*, Exhibit No. 5053; 10/23/23 Trial Tr. at 83:6-11.

Handy also made lodging arrangements for the blockade participants who traveled to Washington, D.C. from other states, including co-defendants: Jay Smith ("Smith"), John Hinshaw ("Hinshaw"), and William Goodman ("Goodman") from New York; Idoni from Michigan; Joan Bell ("Bell") from New Jersey; and Paula "Paulette" Harlow ("Harlow") and Jean Marshall ("Marshall") from Massachusetts. *See, e.g.*, Exhibit Nos. 4001A, 5002, 5091. Additionally, Handy procured monetary donations to pay for an Airbnb lodging reservation at 133 Quincy Place NE, Washington D.C. that she made for herself and co-defendant Herb Geraghty ("Geraghty") who traveled to Washington, D.C. from Pennsylvania on October 21, 2020, to participate in the Surgi-clinic blockade. *See, e.g.*, Exhibit Nos. 4001A, 5001, 5002, 5021, 5091.

The night before the planned clinic blockade, the ten co-defendants – led by Handy and Darnel – discussed the plan for and execution of the blockade. *See, e.g.*, 10/24/23 Trial Tr. at

22:11-23:24.  At the meeting, Handy and Darnel further discussed the Surgi-clinic's layout and floor plan so that each blockade participant knew which clinic doors to blockade.  *Id.*, at 25:21-24.  The group further discussed using locks and chains to block the Surgi-clinic doors, and the consequences of participating in the blockade, which included being arrested by the police and charged with criminal offenses.  *Id.*, at 25:21-24, 28:25-29:25.

On October 22, 2020, the group met again outside a coffee shop near the clinic to have one last discussion as to the planned blockade.  *See e.g.*, 10/25/23 Trial Tr. at 107:1-5 (suggesting meeting place was outside a "coffee house" or "restaurant"); *see also* Exhibit Nos. 2015, 2017. Co-defendant Joan Bell brought to this final meetup a bag containing the chains, locks, and ropes. *Id.*, at 27:23-24.  After additional discussion, the group departed for the clinic to begin successfully obstructing the clinic's operations.  *See, e.g.*, 10/24/23 Trial Tr. at 63:18-21.

The co-defendants and other unindicted co-conspirators arrived at the Surgi-clinic shortly before it was scheduled to open the morning of October 22, 2020.  While several co-defendants hid in the Surgi-clinic's fourth floor building stairwell, Handy and Bell waited outside of the clinic's patient entrance.  *See, e.g.*, 10/25/23 Trial Tr. at 122:6-11; Exhibit No. 1079A.  Handy approached "Sasha Proctor," a medical specialist working at the clinic, in the hallway outside of the clinic and falsely represented herself as "Hazel Jenkins" and stated that she had a medical appointment.  Moments later, Idoni and her co-defendants who hid in the building's stairwell approached the Surgi-clinic's patient entrance.  *See, e.g.*, Exhibit Nos. 1008, 1079A.

Goodman carried the bag of chains, locks, and ropes from the stairwell and placed it on the floor just outside of the Surgi-clinic's patient entrance.  *Id.*  Bell retrieved a bicycle lock from that bag and forcefully entered the clinic.  *Id.*  Harlow picked the bag up and forcefully entered

the clinic behind Bell.   Harlow wore a bicycle lock around her neck in anticipation of using it to

chain herself to Bell and other co-defendants as they blocked the Surgi-clinic's doors.   *See, e.g.*,

Exhibit Nos. 1016, 1079A.

Moments before the Surgi-clinic was scheduled to open at 9:00 a.m., as the co-defendants

gathered outside of the Surgi-clinic's patient entrance, Darnel – who was outside of the clinic's

building - announced an imminent reproductive health clinic blockade on social media and

prepared to livestream the event.   *See, e.g.*, Exhibit Nos. 1017-20, 1022-1024, 1026.   Darnel used

one of his Facebook accounts to create an event he titled, "No one dies today," and captioned it,

"Starting soon!   Tune in!"   *See, e.g.*, Exhibit No. 3001.

At approximately 9:00 a.m., Ms. Proctor unlocked the door to admit the waiting patients

with scheduled appointments.   At that time, the co-defendants (with the exception of Darnel who

was outside of the building livestreaming the event) forcefully entered through the Surgi-clinic's

entrance.   *See, e.g.*, Exhibit Nos. 1008, 1079A.   Co-defendant Smith, who stood at the door when

it was unlocked, forcefully pushed the door open as Ms. Proctor attempted to close the door to

prevent the co-defendants from entering.   *Id.*   The co-defendants collectively pushed and shoved

their way in and against the clinic staff who attempted to keep the co-defendants from entering.

*Id.*

As co-defendant Smith forced his way into the clinic, he pushed clinic nurse "Sara

Compton" causing her to sprain her ankle and suffer bodily injury.   *See e.g.*, Exhibit No. 1001;

10/23/23 Trial. Tr. at 45:23-25. Co-defendants Marshall and Geraghty pushed and shoved against

Ms. Proctor.   And, as Harlow intentionally pushed her way into the clinic, she caused "Tina

Smith," the clinic's administrator, to fall backwards and into a chair.   *See, e.g.*, Exhibit No. 1008.

After forcing their way into the clinic's waiting room, the co-defendants set about physically blockading the Surgi-clinic doors. *See e.g.*, Exhibit No. 1001. Handy directed the blockaders on what to do. *Id.* Hinshaw and Marshall moved chairs in the Surgi-clinic's waiting room to block doors that led to the clinic's treatment areas. *Id.* Harlow, who entered the clinic with the bag of locks, chains, and rope, worked with Smith, Hinshaw, and Bell to intentionally bind themselves together using the chains, ropes and bicycle locks, and they sat in chairs against the Surgi-clinic's interior doors. *Id.* Marshall assisted Harlow, Smith, Hinshaw, and Bell with using the locks and chains to bind themselves together. *Id.* Goodman and Idoni went into the hallway outside of the Surgi-clinic and stood in front of another clinic doorway that was used as an employee entrance. *See, e.g.*, Exhibit Nos. 1008, 1016, 1020, 1079B.

During the blockade, "Ashley Jones," a patient at the clinic, was unable to access the treatment area because co-defendants Bell, Harlow, Smith, Hinshaw, and Marshall blocked the clinic's waiting room doors, and Idoni and Goodman blocked the clinic's staff entrance. *See, e.g.*, Exhibit Nos. 1008, 1016. Ms. Jones was forced to climb onto a chair and through a receptionist window in the waiting room to access the Surgi-clinic's treatment area, which was where the clinic staff remained during the co-defendants' blockade. *Id.*

A second patient, "Shampy Holler," was also unable to access the clinic's treatment area because of the co-defendants' blockade. *See, e.g.*, 9/12/23 Trial. Tr. at 14:22-25. Mrs. Holler, who was experiencing labor pains and in need of immediate medical attention, was forced to lay on the hallway floor outside of the clinic because Idoni and her co-defendants refused to allow Mrs. Holler and her husband to enter. *Id.*, at 15:1-2. At one point as Mrs. Holler lay on the ground, she was accosted by Marshall. *See, e.g.*, Exhibit No. 1079B. As Mrs. Holler attempted

to get up from the floor, Marshall pushed Mrs. Holler back down to the floor in order to prevent her from entering into the facility. *Id.*; *see also* 9/12/23 Trial. Tr. at 21:7-9. After a short time, the clinic staff managed to open the staff entrance briefly and were able to get Mrs. Holler into the clinic. *Id.*, at 21:16-19.

Throughout the entire blockade, Darnel livestreamed the event on social media. *See, e.g.*, Exhibit Nos. 1017-1019, 1022-1024, 1026. Additionally, he assisted his co-defendants in prolonging the blockade by secreting the keys to the bicycle locks used to bind several blockading co-defendants together to an unindicted co-conspirator who was outside of the clinic building. *See* Exhibit No. 1024. Darnel did this in order to delay the blockading co-defendants' inevitable arrests by responding Metropolitan Police Department ("MPD") officers.

The co-defendants remained within the Surgi-Clinic's waiting room for several hours blocking the doors in an effort to interfere with the provision of abortion services. They refused to move or leave the clinic when asked by the clinic's staff and responding police officers. *See, e.g.*, Exhibit No. 1016. The co-defendants were very vocal about their blockade, and their reasons for preventing access to the Surgi-clinic. For example, Handy explained to the first responding MPD officers, "[the co-defendants] were doing a rescue . . . . On the fourth floor is an abortion facility and so today [the co-defendants] are blocking it . . . to not allow people to go inside . . . . [t]o stop abortions today." *See* Exhibit No. 1009. Similarly, while sitting in a chair blocking access to the clinic's treatment area, Harlow explained to one MPD officer, "We can't move. We have permanent locks." *Id*. Harlow then further lectured that same officer, telling him that he "ha[s] a conscience" that should lead him to "let [the co-conspirators] stay" in the clinic to "save lives." *See* Exhibit No. 1137.

After refusing the requests to move or leave the Surgi-clinic, the co-defendants were advised that they would be arrested.   With the exception of Darnel and Geraghty – who left the clinic moments before arrests were made, the remaining co-defendants were arrested.   They passively resisted arrest by going limp, including when the police cut the bicycle locks that Bell and Harlow wore around their necks and placed them under arrest.   *See, e.g.*, Exhibit No. 1016. The arrested co-defendants were carried out of the building and into transport vehicles.

In short, the testimony and exhibits presented proved that the co-defendants refused to move or leave the clinic because it was their intention to interfere with the Surgi-clinic's patients from obtaining, and the clinic staff from providing, pregnancy termination services.   The co-defendants' participation in the planned blockade interfered with Ms. Jones, Mrs. Holler, and other patients from accessing the Surgi-clinic, and further interfered with the clinic staff's ability to provide reproductive health services.

## IV.    Idoni's Criminal Conduct

The evidence at trial proved that Idoni was an active participant in the conspiracy and blockade.   In the weeks leading up to the blockade, Idoni was actively involved in the conversations and meetings where the conspirators agreed to blockade the Surgi-clinic and recruit others to join them.   Idoni further agreed to and did in fact enter the facility and block access.

Idoni's involvement in the conspiracy was significant.   She communicated with Handy in the weeks leading up to the blockade; familiarized herself with the history of "lock-and-block" and "rescues" by reading books authored by co-defendant Bell; and, recruited participants such as Caroline Davis ("Davis") and another unindicted co-conspirator named Eva Zastrow ("Zastrow"). Idoni used social media and in-person meetings at Michigan area abortion clinic protests to recruit

participants in the Surgi-clinic "rescue."   Idoni then traveled with Davis and Zastrow from Michigan to D.C. the day before the planned blockade and participated in a meeting with her co-conspirators to discuss the final plans.   At that meeting, Idoni volunteered to blockade and risk arrest.   Specifically, Idoni stated that she would block "the doctor's door," or staff entrance to the clinic.   The group also discussed tactics to prolong the blockade, which included using locks and chains to bind themselves together.   Handy also encouraged them to go limp during arrests.   The meeting ended with an agreement to have a final walk-through meeting the next morning immediately before the incursion into the clinic.

The conspirators met at a location near the clinic the morning of the blockade.   After a final meeting to walk-through the plan, discuss the clinic's layout, and how the blockaders would enter the facility, Handy divided the conspirators into groups.   Each group separately walked to the clinic building.   The first group, which comprised of Idoni, Handy, and the other blockading co-defendants, walked over to the building.   While Handy and Bell were tasked with posing as a clinic patient ("Hazel Jenkins") and companion who would wait outside of the clinic's main entrance, Idoni and the other blockaders hid in the building's stairwell on the fourth floor.   When the clinic door opened for the first scheduled appointments, which included Handy's fake "Hazel Jenkins" appointment, the blockaders forced entry into the facility.   Once inside of the clinic's waiting room, Handy directed the blockaders to rearrange the furniture, bind themselves together with locks and chains, and block the clinic doors.   Idoni specifically moved from the clinic's waiting room to the staff entrance in the hallway.   Idoni, Goodman, an unindicted co-conspirator, and at times with Geraghty, stood in front of the staff entrance and blocked access into the clinic. Idoni refused to allow patients to enter through that door, which included blocking Ms. Jones and

Mrs. Holler. Idoni refused to follow MPD officers' commands to move. Idoni admittedly blocked access because the clinic performed abortion procedures.

## V.    Idoni's False Trial Testimony

Idoni was one of five Defendants who chose to testify at trial. Contrary to the jury's verdict, Idoni claimed that she did not agree to or obstruct clinic access.

Idoni testified that she was at the clinic on October 22, 2020, to "counsel" women against abortions. Trial 1 8/22/23 P.M. trans, at p. 5. Idoni denied "physically do[ing] anything" to prevent patients from accessing the clinic. *Id.*, at 20. Idoni claimed that she did not have a good memory of the events, but attempted to explain the video footage that showed her blocking access. Idoni stated that she was praying in the hallway outside of the clinic's main entrance. *Id.*, at 21. Idoni denied blocking any clinic doors. *Id.*, at 24.

The jury, however, rejected Idoni's testimony. When confronted with the video evidence, Idoni admitted her involvement in conduct that constituted the crimes she was convicted of. Idoni admitted that it was her understanding that she had participated in a planned clinic blockade. *Id.*, at 35. Idoni admitted that she was arrested for physically blocking a clinic door, which was a decision that she affirmatively made. *Id.*, at 34-35. She drove from Michigan to D.C. and attended a meeting to discuss the blockade. *Id.*, at 41-42. At the meeting, the group discussed Handy's fake appointment. *Id.*, at 53. Idoni then showed up at the clinic the next day and entered the building with her co-defendants. *Id.*, at 50. She admitted hiding in the stairwell and waited for the clinic doors to open for the first morning appointments. *Id.*, at 52. She admitted entering the clinic following the forced entry. *Id.*, at 56. Despite these admissions, Idoni refused to admit that she blocked the clinic's staff entrance. *Id.*, at 60. Instead, she attempted to choose her words

carefully and claimed that she merely "stood in front of it." *Id.*  Idoni made excuses and denied

preventing Ms. Jones from accessing the clinic. *Id.*, at 62-63.  And, she denied blocking Mrs.

Holler despite video footage showing Idoni obstructing Mrs. Holler's access. *Id.*, at 68.

## VI.    Statutory Penalties

The two counts, for which Idoni and her co-defendants were convicted, carry the following

statutory penalties:

Count 1:   Conspiracy against Rights, in violation of 18 U.S.C. § 241, carries a maximum
sentence of 10 years' incarceration;

Count 2:   Clinic Access Obstruction, in violation of 18 U.S.C. § 248(a)(1) & (b), carries a
maximum sentence of 12 month's incarceration.

## VII.    Sentencing Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings

by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 45

(2007); *Rosales-Mireles v. United States*, 585 U.S. 129, 133 (2018) ("[D]istrict courts must begin

their analysis with the Guidelines and remain cognizant of them throughout the sentencing

process.") (internal quotations and citations omitted).  "[T]he Guidelines remain the foundation

of federal sentencing decisions. *Hughes v. United States*, 584 U.S. 675, 685 (2018).  "As a

matter of administration and to secure nationwide consistency, the Sentencing Guidelines should

be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49.

The Sentencing Guidelines are "the product of careful study based on extensive empirical evidence

derived from the review of thousands of individual sentencing decisions." *Id.* at 46.

The government agrees with the Sentencing Guidelines calculation set forth in the Presentence Investigation Report ("PSR").    ECF No. 533.    Idoni's Base Offense Level for both counts of conviction is 12.    PSR at ⁋ 77.    And, her Base Offense Level is adjusted as follows:

| Guideline | Description | Adjustments |
|---|---|---|
| § 2H1.1(a)(2) | Where the offense involved two or more participants | 12 |
| § 3A1.1(b)(1) | Vulnerable victim[2] | 2 |
| § 3A1.3 | Restraint of victim[3] | 2 |
| § 3C1.1 | Obstructing or impeding the administration of justice[4] | 2 |
| § 3D1.4 | Combined offense level for two equally serious groups | 2 |
| **Combined Adjusted Offense Level** | | **20** |

*See id.*, at ⁋⁋ 79-97.    Based upon Idoni's criminal history as reflected in the PSR, Idoni should be sentenced under **Criminal History Category I**.    *See id.*, at ⁋ 103.    Accordingly, Idoni's Guidelines sentencing range is 33-41 months.

## VIII.    Section 3553(a) Sentencing Factors

The Court should next consider the sentencing factors set forth in 18 U.S.C. § 3553(a). *Gall*, 552 U.S. at 49-50.    That Section provides that Court consider the following:    (A) "the

---

[2] This adjustment is applicable because Ms. Jones and Mrs. Holler were pregnant and unusually vulnerable due to their physical condition.    *See, e.g.*, *United States v. James*, 139 F.3d 709, 714-15 (9th Cir. 1998) (Affirming the trial court's application of the vulnerable victim adjustment where the defendant threatened a pregnant bank teller during the commission of a bank robbery).

[3] "Physically restrained" means the forcible restraint of the victim *such as* being tied, bound, or locked up.    U.S.S.G. §1B1.1 (Application note 1(K)) (emphasis added).    The use in the definition of "such as" indicates that the terms are merely illustrative examples and do not limit the type of conduct that may constitute a physical restraint.    *Arcoren v. United States*, 929 F.2d 1235, 1246 (8th Cir. 1991) (Restraint of victim adjustment applied in case where the victims were pushed into a room and prevented from leaving); *see also United States v. Stokley*, 881 F.2d 114, 116 (4th Cir. 1989) (same).

[4] This upward adjustment is appropriate because Idoni committed perjury at trial.

nature and circumstances of the offense," 18 U.S.C. § 3553(a)(1); (B) "the history and characteristics of the defendant," *id*.; (C) promotion of "respect for the law," 18 U.S.C. § 3553(a)(2)(A); (D) general and specific "deterrence," 18 U.S.C. ' 3553(a)(2)(B)(C); (E) the Guidelines and Guideline range, § 3553(a)(4); and (F) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." § 3553(a)(6).

### A.    Nature and Circumstances of the Offenses

The first factor this Court should consider is the nature and circumstances of the offense. Idoni participated in a reproductive health clinic blockade involving numerous participants with the goal to prevent patients from obtaining, and providers from providing, abortion services.

Among other things, Idoni used social media and her cellular phone to communicate with her co-conspirators.   Idoni recruited other participants from Michigan to join her in D.C. to block clinic access.   Idoni encouraged two women, one of whom was Davis, to travel with Idoni from Michigan to D.C. to meet with other co-conspirators to plan and execute the clinic blockade. Idoni knew the purpose of the blockade was to prevent patients from obtaining, and providers from providing, pregnancy termination services.   Idoni volunteered to block a clinic door with her body; Idoni knew about Handy's fake appointment to ensure that Idoni and her co-defendants could enter the facility; and Idoni knew that she would likely be arrested for blocking clinic access and refusing to leave.   Then, she hid in the building's stairwell and waited for the clinic door to be opened.   Once it was, she and her co-defendant used force to enter the facility.   After entering, Idoni encouraged some of her co-defendants to use locks and chains to bind themselves together, while Idoni stood in front of the staff entrance in the hallway and blocked access.   Idoni refused

to move and allow Ms. Jones and Mrs. Holler to enter, all while knowing that her crime was being livestreamed on social media.    Because of Idoni's conduct, Ms. Jones was forced to climb through a window to receive her care, and Mrs. Holler collapsed in pain while being blocked from accessing the clinic.    Both Ms. Jones and Mrs. Holler had already begun their procedures, so denying them access to the clinic was especially egregious.

A prison sentence at the high-end of the Guidelines range would account for the seriousness of Idoni's offenses.    Her strongly held anti-abortion beliefs led her to drive from Michigan to D.C. to participate in an organized Surgi-clinic blockade.    The blockade, which was broadcasted to an on-line audience, encouraged others to commit similar crimes, publicized Idoni's own offense, and traumatized the victims.    The blockade will have lasting impacts on Ms. Jones, Mrs. Holler, and the clinic staff, which they will likely struggle with life-long.

### B.    The History and Characteristics of the Defendant

Idoni's history and characteristics support the imposition of a high-end Guidelines prison sentence.    Idoni's personal history of participating in clinic invasions both before and after the charged offenses further warrant imposition of a Guidelines sentence.

As demonstrated by her civil rights conspiracy and FACE Act convictions from the Middle District of Tennessee, Idoni similarly planned and blockaded a reproductive health clinic on March 5, 2021, just months after the Surgi-clinic blockade.    *See United States v. Gallagher*, et al., 22-cr-324, at ECF Nos. 3, 516 (M.D.TN).    In *Gallagher*, Idoni similarly used social media and in-person meetings to communicate with her co-conspirators.    *Id*.    She traveled from Michigan to Tennessee and entered the building of a reproductive health facility with the intent to prevent patients and providers from exercising their reproductive health rights.    *Id*.    Idoni used her body

14

to block access to the facility and refused to move when commanded by local police.   *Id*.   And, the *Gallagher* blockade, like the Surgi-clinic blockade, was livestreamed.   *Id*.

Idoni was further charged by federal authorities from the Eastern District of Michigan with civil rights conspiracy and FACE Act offenses for blockading *two* separate reproductive health services facilities.   First, she planned and on August 27, 2020, executed a reproductive health services facility blockade in Sterling Heights, Michigan; and second, Idoni blockaded a facility in Saginaw, Michigan, on April 16, 2021.   *See United States v. Zastrow*, et al., 23-cr-20100, at ECF No. 3.   Idoni's first blockade charged in Count One of the *Zastrow* indictment occurred less than two months before her participation in the offenses in this case; and her subsequent *Zastrow* blockade charged in Count Two of that indictment occurred weeks after her participation in the *Gallagher* blockade, and involved using locks, where Idoni bound herself to one of the Saginaw facility's entrances.   Although the *Zastrow* case is pending trial in the Eastern District of Michigan, Idoni has demonstrated a history of blockading abortion facilities.

Accordingly, a high-end Guidelines prison sentence would appropriately address Idoni's history of obstructing access and personal characteristics of using locks in some cases to further her crimes.

C.     *Promotion of Respect for the Law*

Considering the gravity of the offenses, a significant sentence in this matter is necessary to reflect the seriousness of the offense and promote respect for the law.   *See Gall*, 552 U.S. at 54 (recognizing that "a lenient sentence for a serious offense threatens to promote disrespect for the law").   A Guidelines sentence is appropriate in this case because Idoni planned with others to "injure, oppress, threaten, and intimidate" the clinic's patients and providers from exercising their

15

reproductive health rights free from violence and obstruction.   *See* Superseding Indictment, ECF No. 113.   As established at trial, Idoni understood that she had agreed with her co-conspirators to commit a crime, and that it was a violation of the FACE Act.   She and her co-defendants were prepared to be arrested knowing the consequences of their actions.   Idoni's clinic blockade involved the use of force, which resulted in one provider suffering bodily injury.   Idoni also forced Ms. Jones to climb through a window to access the clinic, and prevented Mrs. Holler, who was suffering labor pains, from getting up off the floor and entering the facility.   The physical obstruction was especially traumatic for the clinic patients who testified at trial, which was apparent during the offense and their emotional trial testimony.   *See*, *e.g*., USA Ex. No. 1011.

A high-end Guidelines sentence would also promote respect for the law.   Idoni faced a clear choice: to engage in forceful and obstructive conduct or engage in lawful protest.   Idoni chose the former and along with her co-defendants' forceful over-took the clinic that obstructed access to the facility.   The trial evidence proved that Idoni appreciated the criminality of her conduct in committing a crime by blockading the clinic, and that despite knowing the consequences of her actions, she chose to violate federal laws.   All of Idoni's choices point to the obvious need for a high-end Guidelines prison sentence that will promote respect for the law.

D.   *General and Specific Deterrence*

Imposition of a significant sentence is necessary to provide for both general and specific deterrence.   "Under the theory of general deterrence, the government essentially seeks to make an example of an offender through punishing him so that other potential offenders are intimidated into refraining from committing the contemplated crime."   *United States v. Slatten*, 865 F.3d 767, 819 (D.C. Cir. 2017) (noting that "harsh sentences" "generally operate as strong deterrents");

*United States v. Diaz-Navarro*, 567 F. App'x 256, 257 (5th Cir. 2014) (since defendant had committed offense before and received a light sentence a "'long incarceration period'" was necessary for deterrence);    *United States v. Rivera*, 488 F. App'x 225, 227 (9th Cir. 2012) (harsh sentence necessary for deterrence in light of defendant's recidivism).

First, a significant sentence is necessary "to afford adequate deterrence to criminal conduct" by others.    18 U.S.C. 3553(a)(2)(B).    Sentencing Idoni to a period of incarceration would deter other abortion extremists (whether pro-life or pro-choice) from obstructing access to reproductive health services.

Second, a significant sentence is also necessary for specific deterrence.    In light of Idoni's strongly held beliefs, and history of participating in clinic invasions both before and after the charged offenses in this case, a prison sentence will deter her from engaging in future violations of federal law.

Without imposition of a significant Guidelines sentence here, Idoni and other would-be violators will not be discouraged from engaging in misconduct and may believe that there are relatively minimal consequences for flagrantly committing crimes that target the provision of reproductive health care.

###### E.    *The Sentencing Guidelines*

Examination of the Section 3553(a) factors shows that a high-end Guidelines sentence is appropriate in this case.    While a "sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply," *Rita v. United States*, 551 U.S. 338, 351(2007), and it "may not presume that the Guidelines range is reasonable," *Gall*, 552 U.S. at 50; *Nelson v. United States*, 555 U.S. 350, 350 (2009), "even in an advisory capacity the Guidelines

serve as 'a meaningful benchmark' in the initial determination of a sentence and 'through the process of appellate review.'"  *Rosales-Mireles*, 585 U.S. at 133.

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."  *Rita*, 551 U.S. at 349.  As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'"  *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m).  In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108.  As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. § 1A1.1, intro, comment 3.  More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process.  *See* 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines).  Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case.  Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005).

In light of Idoni's conduct in this case and others, a high-end Guidelines prison sentence would be reasonable and appropriate for both counts of conviction.   A Guidelines prison sentence here would be 31 to 41 months – a significantly lesser amount of time than the maximum allowable

sentence for her counts of conviction (Count One statutory maximum sentence of 10 years; Count Two statutory maximum sentence of 12 months).   Such a sentence would be reasonable because it accounts for her conduct in D.C., as well as her conduct in other clinic blockades in Tennessee and Michigan.   And, it would be sufficient, but not greater than necessary, to comply with the basic aims of Section 3553(a).   *Rita*, 551 U.S. at 348.

F.      *Unwarranted Sentencing Disparities*

This Court should impose a Guidelines sentence to avoid any unwarranted sentencing disparities.   18 U.S.C. § 3553(a)(6); *see, e.g.*, *Molina-Martinez v. United States*, 578 U.S. 189, 193 (2016) ("Uniformity and proportionality in sentencing are achieved, in part, by the Guidelines' significant role in sentencing"); *United States v. Alford*, 89 F.4th 943, 953 (D.C. Cir. 2024) ("Thus, '[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly.'"); *United States v. Otunyo*, 63 F.4th 948, 960 (D.C. Cir. 2024) (same).

Although Idoni and her co-defendants in this case, along with her co-defendants from the *Gallagher* prosecution in the Middle District of Tennessee, will be the first groups of defendants sentenced for conspiring to violate reproductive health rights, they all are similarly situated to other Section 241 convicted defendants who received Guidelines sentences where the objects of their civil rights conspiracy targeted other federally protected rights.   *See, e.g.*, *United States v. Liddy*, 542 F.2d 76, 78 (D.C. Cir. 1976) (Defendant convicted of violating Section 241 (Fourth Amendment right at issue) sentenced to a term of imprisonment from one to three years); *United States v. Stewart*, 65 F.3d 918, 931-32 (11th Cir. 1995) (Court imposition of a Guidelines sentence in a Section 241 prosecution affirmed (42 U.S.C. § 3631 housing rights at issue)); *United States v.*

*Whitney*, 229 F.3d 1296, 1309 (10th Cir. 2000) (same); *United States v. Allen*, 341 F.3d 870, 897 (9th Cir. 2003) (affirming Guidelines sentence for Section 241 conviction with right at issue was denial of public accommodations because of race); *United States v. McCoy*, 480 F.App'x 366, 373 (6th Cir. 2012) (Guidelines and statutory maximum sentence imposition affirmed for convictions of Sections 241 and 242).   Therefore, a Guidelines sentence for Idoni would not result in any sentencing disparities.

The government also strongly opposes any requested variance from the Sentencing Guidelines.   Idoni's conduct showed a flagrant disregard for women's reproductive health rights, and the lack of concern for Ms. Jones and Mrs. Holler who, for example, sought care during a particularly sensitive time in their lives.   Combined with the other sentencing factors, a high-end Guidelines prison sentence would serve all of the Section 3553(a) factors.

## IX.    Requested Sentence

The government requests this Court sentence Idoni to a term of imprisonment at the top end of her applicable Sentencing Guidelines range, which is 33-41 months.   The advisory Guidelines Sentencing range should be given considerable weight.   First, the Guidelines range is itself a § 3553(a) factor.   "The fact that § 3553(a)[(4)] explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process."   *Gall*, 552 U.S. at 50, n.6.   Second, one of the Sentencing Commission's purposes in promulgating the Guidelines was to "assure the meeting of the purposes of sentencing as set forth in section 3553(a)(2)."   28 U.S.C. §§ 991(b)(1)(A), 994(f).   The Commission wrote the Guidelines to "carry out these same § 3553(a) objectives," resulting in "a set of Guidelines that seek to embody the § 3553(a)

considerations, both in principle and in practice." *Rita*, 551 U.S. 338, 350.   "[W]here judge and Commission both determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that significantly increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347.   In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.[5]

Idoni was a key participant in the instant offense as well as in other clinic blockades she committed in Tennessee and Michigan.   Despite a history of arrests and local prosecutions for participating in other clinic invasions, Idoni has not been deterred from violating federal laws. Idoni not only capitalized on her victimization of vulnerable victims, she and her co-defendants promoted and publicized their crimes.   She has joined other violators to blockade clinics, and prolonged obstructing access.   Idoni also committed perjury and had not demonstrated any willingness to stop or encourage others to find lawful ways to advance their beliefs.   A high-end Guidelines prison sentence in the 33-41 months range will appropriately address all the Section 3553(a) factors and vindicate the rights of those whom Idoni victimized.

Respectfully submitted,

KRISTEN CLARKE

---

[5]       The government respectfully disagrees with Probation's recommendation for a downward variance.   ECF # 534.   Their recommendation is based on the following: (1) the nature of the circumstances of the offense, and (2) to avoid unwarranted sentence disparities.   *Id.* at 2.   As set forth above, the government believes that the nature and circumstances of the offenses – attempting to deny the receipt of reproductive health care and intentionally inflicting physical and mental pain on patients – merits a Guidelines sentence; and, as the D.C. Circuit has held, imposing a Guidelines sentence is the best way to avoid unwarranted sentencing disparities.

ASSISTANT ATTORNEY GENERAL
CIVIL RIGHTS DIVISION
*/s/ Sanjay H. Patel*
SANJAY H. PATEL
IL Bar. No. 6272840
Trial Attorney
Criminal Section, Civil Rights Division
Email: Sanjay.Patel@usdoj.gov

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052
*/s/ John Crabb Jr.*
JOHN CRABB JR.
NY Bar No. 2367670
REBECCA G. ROSS
NY Bar No. 5590666
Assistant United States Attorneys
601 D Street, NW
Washington, DC 20001
John.D.Crabb@usdoj.gov
Rebecca.Ross2@usdoj.gov